Robert Joseph ULRICH, Appellant,

v.

KASCO ABRASIVES COMPANY et
al., Appellees.

Supreme Court of Kentucky.

Jan. 23, 1976.

Murray J. Greenwald, Ralph G. Stone, Louisville, for appellant.

Walter R. King, Joseph H. Eckert, Charles E. Duncan, Duncan & Lehnig, Louisville, for appellees.

PALMORE, Justice.

The appellant, Robert Ulrich, was employed by the Marley Company as a welder. His duties included the operation of portable grinding machines. While he was operating one of these grinders the abrasive wheel or disc that had been mounted on it disintegrated, or "exploded," as it is described. Some of the pieces of the wheel struck him in the area of the groin, causing painful and permanent injury. He brought suit against Kasco Abrasives Company, manufacturer of the wheel, and Aro Corporation, manufacturer of the grinder, under the strict liability theory. Cf. *Restatement, Torts 2d,* § 402A. He appeals from a judgment entered pursuant to a jury verdict for both defendants-appellees.

One of the assignments of error is that the trial court should not have submitted the issue of contributory negligence. Another is that the instructions covering basic liability of the defendants were erroneous. We find it unnecessary to reach either of these arguments, being of the opinion that each of the defendants was entitled to and should have been given a directed verdict in its favor.

The Marley Company had a number of similar grinders, all made by the same manufacturer, Aro. All of the wheels used with them also were made by the same manufacturer, Kasco. The grinders and wheels were kept in a "tool crib" from which they were drawn by various personnel as needed. It was the duty of the person in charge of the tool crib to remove and replace the wheels when they became worn or damaged. Personnel using the grinders, such as Ulrich, were instructed "not to fool with them." Other personnel, in the maintenance department, had the sole responsibility of maintaining and keeping them in good working order.

The grinders were powered by air pressure, which might vary to some extent, but contained governing mechanisms designed to prevent a rotor speed in excess of 6,000 rpm. Instruction sheets furnished by the manufacturer with each new unit stated that the rotor speed had been set at the factory, that any change might result in wheel explosion, and that adjustment of the governor should be made only by "capable authorized personnel." A metal label on the grinder housing bore the manufacturer's name and the words, "Check RPM with each wheel change." The only means for testing this speed is with a tachometer.

The Marley Company had no tachometers, so obviously its maintenance people never complied with this instruction.

The wheel made by Kasco had on it a label stating "maximum rpm 6,000." Furnished with it by the manufacturer was a list of "do's and don'ts," one of which was "Don't ever exceed maximum operating speed for the wheel." It was well recognized in the industry that the centrifugal force generated by excessive speed will result in disintegration of this kind of wheel.

There is not any question as to what caused this accident. The grinder had been in use for some five years. It was "battered and banged up." The spool part of the governor-valve was worn out and could not be properly fitted into place. As a result the governor was inoperable. When tested in its condition following the mishap it ran at speeds up to 9,000 rpm and caused similar wheel explosions. There was no evidence that the wheel was defective.

Ulrich was an 18-year-old with a high school education. He had taken a course in welding which included training in the use of portable grinders. He received no further instruction in that respect from the Marley Company and had no knowledge of what might occur if the grinder should happen to run at an excessive speed. All he did in this instance was to inspect the wheel and the protective shield on the grinder before using it. He depended on his employer's other personnel for the operating condition of the machine and installation of the wheel. He had seen the "do's and don'ts" issued for the users of abrasive wheels but had never noticed the maximum speed caveat on the label of the wheel. It was, he said, not "my concern." Nor had he ever read the speed warning on the panel attached to the grinder (which had to be turned upside down from its operating position in order for the label to be observed).

Ulrich did not draw this particular grinder from the tool crib, but got it at another place in the Marley factory where it had been used by somebody else.

Since there was no provable defect of the wheel and the grinder itself was not in substantially the same condition as it had been when put on the market by Aro, the case against both manufacturers is pitched largely on the theory of inadequate warning. Cf. *Post v. American Cleaning Equipment Corporation*, Ky., 437 S.W.2d 516, 520–522 (1968). It is contended also that the grinder should have been equipped with a tachometer and that there should have been safeguards to prevent improper assembly of the governor mechanism incident to the process of maintenance and repair. These latter contentions relate, of course, to design.

This court in *Dealers Transport Co. v. Battery Distributing Co.*, Ky., 402 S.W.2d 441, 446–447 (1966), subscribed to the principle of strict liability set forth in § 402A of the *Restatement, Torts 2d*. Later, in *Jones v. Hutchinson Manufacturing, Inc.*, Ky., 502 S.W.2d 66, 69 (1973), the principle was related to defective-design cases as follows:

> "Section 402A of the Second Restatement expresses the so-called 'strict liability' principle in terms of a product 'in a defective condition unreasonably dangerous to the user or consumer or to his property.' Prosser, the principal draftsman of this section, says in his treatise that a product is 'defective' for purposes of application of the strict liability principle when it is made according to an unreasonably dangerous design. Prosser, Handbook of the Law of Torts, section 99, page 659 (4th Edition 1971)."

■ Our opinion in *Jones* was not meant, as suggested in the comment appearing at 62 Ky.L.J. 866, 867 (1974), "to define a defect as a variation from industry standards for similar products in such a way that it was negligent to produce such a variation." To the contrary, it was and is our view that such a variation can amount

to no more than *evidence bearing on the ultimate factual issue of whether the product was unreasonably dangerous.* To emphasize this point we quote from the portion of *Prosser* cited in *Jones* as follows (italics ours):

"The question of when a product is unreasonably unsafe has occupied a good many writers. The language of the Second Restatement of Torts in dealing with it is that for strict liability the product must be 'in a defective condition unreasonably dangerous to the user or consumer or to his property.' This terminology may perhaps leave something to be desired, since it is clear that the 'defect' need not be a matter of errors in manufacture, and that a product is 'defective' when it is properly made according to an unreasonably dangerous design,[72] or when it is not accompanied by adequate instructions and warning of the dangers attending its use.[73]

[72] Since proper design is a matter of reasonable fitness, the strict liability adds little or nothing to negligence on the part of the manufacturer; but it becomes more important in the case of a dealer who does not design the product.

[73] Again, in the case of the manufacturer, the strict liability adds little or nothing to negligence; but where the sale is by a dealer, who does not know the danger, it becomes important.

"The prevailing interpretation of 'defective' is that the product does not meet the reasonable expectations of the ordinary consumer as to its safety. It has been said that this amounts to saying that *if the seller knew of the condition he would be negligent in marketing the product.*"

■ As we see it, divorced from the glut of erudition erupting from the scholars, a theory of strict liability for manufacturers of mechanical products ought to be rather simple. The product either is or is not unreasonably dangerous to a person who should be expected to use or be exposed to it. If it is, it can make no difference whether it is dangerous by design or by accident. As aptly observed in 62 Ky. L.J. 866, 875, "the important factor is how safe or dangerous the product is when used as it was intended to be used" [or should reasonably have been anticipated to be used]. If the danger is unreasonable because it is not obvious and may not be apprehended by such a person, then it may be obviated by an adequate warning, so provided or affixed that in the ordinary course of events it will reach and should be understood by that person. Whether such a warning is so provided is nothing more than one of the factors determining whether the product is unreasonably dangerous. Cf. *Restatement, Torts 2d,* § 402A, Comment *j.*

■ Though strict liability does not depend upon negligence, a degree of kinship between the two does inhere in the term "unreasonably dangerous." Both utilize the concept of reasonable foreseeability. The difference is that negligence depends on what a prudent manufacturer, engaged in a business similar to that of the defendant, by the exercise of ordinary care actually should have discovered and foreseen, whereas strict liability depends on what he would have anticipated had he been (but regardless of whether he actually was or should have been) aware of the condition of and potentialities inhering in the product when he put it on the market. Where the one is actual, the other is postulated.

■ Applying the foregoing standards to this case, we are of the opinion that a jury could not justifiably find either the grinder or the wheel, marked and labeled as it was, unreasonably dangerous in the sense that a prudent manufacturer of similar products fully apprised of the condition and tendencies of the product when he put it in the stream of commerce would have anticipated a substantial likelihood of injury to a workman using the grinder and exercising ordinary care for his own safety. Hence neither product was "unreasonably dangerous."

Any high-powered piece of machinery can be dangerous if it is improperly maintained or repaired. There is a limit beyond which the manufacturer simply cannot as a practical matter be expected to go. He is entitled, we think, to rely on the owner of the machine to assume the responsibility for keeping it in safe working order. The owner's failure to do so (and to warn the operator accordingly) might constitute superseding negligence if it could be found that the tool was unreasonably dangerous in the first place, cf. *Hercules Powder Company v. Hicks,* Ky., 453 S.W.2d 583, 591 (1970), but in this particular instance we hold as a matter of law that it could not.

The judgment is affirmed.

All concur.