MONTGOMERY ELEVATOR
COMPANY, Appellant,

v.

Kevin T. McCULLOUGH, A Minor by his
Parent and Next Friend, M. James
McCULLOUGH, Jr. and Federated De-
partment Stores d/b/a Shillito's De-
partment Stores, Appellees.

Kevin T. McCULLOUGH, a Minor, by
his Parent and next friend, M. James
McCULLOUGH, Jr., Appellant,

v.

MONTGOMERY ELEVATOR COMPANY
and Federated Department Stores
d/b/a Shillito's Department Stores, Ap-
pellees.

Supreme Court of Kentucky.

July 5, 1984.

Rehearing Denied Oct. 25, 1984.

Robert C. Cetrulo, Covington, for appellant/Montgomery Elevator.

Joseph W. Gelwicks, Cincinnati, Ohio, for appellee/Federated Department Stores.

Lanny R. Holbrook, Cincinnati, Ohio, for appellee/Kevin T. McCullough.

LEIBSON, Justice.

This is a products liability case. On February 24, 1979, Kevin T. McCullough, a ten-year-old boy, was riding the down escalator in the Shillito's Department Store at the Florence Mall Shopping Center in Florence, Kentucky, when the tennis shoe on his right foot was caught up and crushed into the space between the treads and the side skirt of the escalator. He suffered a crushing, cutting injury which resulted in the amputation of the big toe on his right foot.

The escalator in question was purchased by Federated Department Stores, which owns and operates Shillito's, from Montgomery Elevator Co. It was built in 1976 and installed and accepted by Federated in February 1977. Thereafter the escalator was maintained by Federated.

Originally the child's claim was filed against both Federated and Montgomery Elevator. Before trial that part of the claim against Federated was settled for $30,000. McCullough's claim against Montgomery Elevator, based on defective design of the product, was submitted to a jury which awarded $51,511.75. Under an interrogatory which permitted the jury to apportion responsibility between Federated and Montgomery Elevator, the jury found each to be 50% responsible. The trial court entered judgment against Montgomery Elevator for $25,755.87.

Montgomery Elevator appealed to the Court of Appeals claiming it was entitled to a directed verdict and also claiming trial errors. The Court of Appeals decided against Montgomery Elevator's claim that it was entitled to a directed verdict, but

sustained Montgomery Elevator's claim that there were trial errors in the instructions and in the admission of certain evidence regarding prior accidents. The Court of Appeals remanded the case for a new trial.

Both Montgomery Elevator and McCullough have appealed from the decision of the Court of Appeals. Montgomery Elevator claims the Court of Appeals erred because it was entitled to a directed verdict. McCullough claims the Court of Appeals erred because it sustained Montgomery's position regarding instructions and evidence of prior accidents.

We have granted both sides' motions for discretionary review. We affirm the decision of the Court of Appeals that Montgomery Elevator was not entitled to a directed verdict. We reverse the decision of the Court of Appeals that there was any error in either the trial court's instructions or in the introduction of evidence concerning prior accidents so substantial as to justify a new trial.

The heart of this case is McCullough's claim that the escalator in question was defectively designed when manufactured and Montgomery Elevator's claim that it is not liable because of letters sent to the purchaser, Shillito's, *after* the escalator had been installed advising the purchaser of the escalator's propensity for catching up tennis shoes "between the escalator steps and the escalator skirt panel" (the "tennis shoes" phenomena), letters suggesting remedial measures to decrease the likelihood of such instances. Montgomery Elevator offered to sell Shillito's "a kit of stiffener angles that can be applied to your present Montgomery standard escalator skirts" as a deterrent against such accidents. Shillito's failed to purchase and provide the recommended remedial measures.

McCullough's evidence was that an escalator of safer design, guarding against the defect giving rise to the "tennis shoes" phenomena was being manufactured at the same time and in the same plant side by side with the type sold to Shillito's.

■ Montgomery Elevator claims that its letters provided adequate warning to the purchaser of the potential danger and how to deal with it, and that such warning bars a claim against the manufacturer by a member of the public injured while using Shillito's escalator regardless of whether the product was defective when sold. The question is: What is the effect of such letters from the manufacturer to the purchaser when the claim is on behalf of a third party not sharing in their transactions? Are they a complete defense, a question of intervening or superseding cause for the jury to consider, or no defense whatsoever?

The answer is that such letters are not a defense in the circumstances of this case where the person injured is a member of the public, a bystander or a user without notice of the dangerous propensities of the product. This answer disposes of Montgomery Elevator's claim to a directed verdict and to its further claim to an instruction of the type discussed in *Bohnert Equipment Co. v. Kendall*, Ky., 569 S.W.2d 161 (1978).

■ There is no area of tort law that has generated more confusion than the question of superseding or intervening cause. The question, complicated enough in a negligence action, is further confused by potential differences that may exist where the claim is based on products liability. Cases presenting seemingly diverse results on somewhat similar fact patterns are *Ford Motor Co. v. Atcher*, Ky., 310 S.W.2d 510 (1957), *Post v. American Cleaning Equip. Corp.*, Ky., 437 S.W.2d 516 (1969), *Bohnert Equipment Co. v. Kendall*, Ky., 569 S.W.2d 161 (1978), and *Sturm, Ruger & Co., Inc. v. Bloyd*, Ky., 586 S.W.2d 19 (1979). While we do not suggest that these cases can be fully reconciled, in this opinion we hope to clarify and simplify the subject of intervening cause as it applies to the present fact pattern—a products liability claim against a manufacturer based on initial defective design of the product, where the manufacturer claims that adequate notice of the defect and remedial suggestions were offered to the purchaser and that the purchaser's failure to remedy the defect was a superseding or intervening cause. In such circumstances the purchaser who uses the product, knowing of the danger and failing to take remedial measures, is also culpable. The question is whether the purchaser's failure to act cuts off the manufacturer's responsibility.

The landmark cases directing our inquiry are *House v. Kellerman*, Ky., 519 S.W.2d 380 (1974), analyzing intervening cause, and *Nichols v. Union Underwear Co., Inc.*, Ky., 602 S.W.2d 429 (1980), analyzing liability for defective design in a products liability case.

In *House v. Kellerman*, a passenger grabbed the steering wheel of a sliding car. *House v. Kellerman* states:

> "To begin with, literally speaking there can never be only one 'cause' of any result. Every cause is a collection of many factors, some identifiable and others not, all determined by prior events. The law seeks out only the collective cause or causes for which it lays responsibility on some person or persons." 519 S.W.2d at 382.

The trial court had instructed the jury on intervening cause as a defense. Overruling previous cases to the contrary, we held that:

> "The question of whether an undisputed act or circumstance was or was not a superseding cause is a legal issue for the court to resolve, and not a factual question for the jury."
>
> . . . .
>
> "Only when (1) an act which is claimed to have taken place would be a superseding cause as a matter of law, and (2) there is an issue of fact as to whether it happened, should there be an instruction mentioning it, and that instruction should tell the jury in substance that unless it believes from the evidence that it did *not* happen it shall find for the defendant, . . ." 519 S.W.2d at 383.

■ *House v. Kellerman* adopts the principles of *Restatement (Second) of*

*Torts,* §§ 440–453 (1965) and of Prosser, *Law of Torts,* §§ 44–45 (4th Ed., 1971) for determining what facts are legally sufficient to constitute an intervening cause. They are facts of such "extraordinary rather than normal," or "highly extraordinary," nature, unforeseeable in character, as to relieve the original wrongdoer of liability to the ultimate victim. *House v. Kellerman, supra,* 519 S.W.2d at 382. Section 452(1) of the *Restatement (Second) of Torts,* provides that "the failure of a third person to act to prevent harm to another threatened by the actor's negligent conduct is not a superseding cause of such harm," with rare exceptions.

*Peterson v. Bailey,* Ky.App., 571 S.W.2d 630 (1978), illustrates the point. It holds that the failure to take appropriate actions to stop the spread of a fire was not of such "utterly foolhardy, or extraordinary" nature as to limit the liability of the defendant who caused the fire.

In *Ford Motor Co. v. Atcher, supra,* a small boy had fallen from his mother's automobile when a rear door came open. The negligent failure of the child's mother to repair a defective door latch exposed her child to the risk of the door opening while the car was in operation. The mother's negligence was found to be an intervening cause. Perhaps such negligence constitutes an act of such "utterly foolhardy, or extraordinary" nature as to limit the liability of the car company. A better explanation is that the accident happened in 1949 and *Ford Motor Co. v. Atcher* is a case almost thirty years old. It predates the modern era of the law of products liability which came with § 402A of the *Restatement (Second) of Torts* in 1965 and which shifts the focus from users to the product itself. Under Comment i of § 402A, "an unreasonably dangerous defect" which is a proximate cause of the plaintiff's injuries, will result in liability being imposed, even with *deliberate* nonaction by the purchaser who continues to use the product unchanged. One of the risks that have induced the overwhelming majority of courts to impose strict liability upon the makers of defective products is the danger that purchasers will continue to use dangerous machinery without safety alterations. *Ford Motor Co. v. Atcher* was negligence law. It is not available to insulate the manufacturer in a products liability case.

■ The fundamental shift in products liability law from a negligence standard to the new theory expressed in § 402A of the *Restatement (Second) of Torts* occurred in Kentucky in 1966 when § 402A was adopted in *Dealers Transport Co. v. Battery Distributing Co.,* Ky., 402 S.W.2d 441 (1966). The shift is from the conduct of the actor, which is the problem in negligence cases, to the condition of the product. This is the "special liability" in § 402A of persons engaged in the business of manufacturing or selling products and the standard for such liability is if the product is "in a defective condition unreasonably dangerous to the user or consumer ...." The four key words are "defective condition unreasonably dangerous." For the next fifteen years we struggled with the meaning of these words. Then, just as *House v. Kellerman, supra,* is the landmark case on the subject of causation, *Nichols v. Union Underwear Co. Inc.,* Ky., 602 S.W.2d 429 (1980), is the landmark case on the definition of a defective product.

■ In *Nichols,* we arrived at a simple standard for the trier of fact to use to apply the words in § 402A. The manufacturer is *presumed to know* the qualities and characteristics, and the actual condition, of his product at the time he sells it, and the question is whether the product creates "such a risk" of an accident of the general nature of the one in question "that an ordinarily prudent company engaged in the manufacture" of such a product "would not have put it on the market." *Nichols v. Union Underwear Co., Inc., supra,* 602 S.W.2d at 433. Considerations such as feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the products' inherently unsafe characteristics, while they have a bearing

on the question as to whether the product was manufactured "in a defective condition unreasonably dangerous," are all factors bearing on the principal question rather than separate legal questions. In a particular case, as with any question of substantial factor or intervening cause, they may be decisive.

For instance, in *Jones v. Hutchinson Mfg. Inc.*, Ky., 502 S.W.2d 66 (1973), we decided that the danger from the product was so apparent that as a matter of law it was unreasonable to fix liability on the manufacturer for the injury caused by the circumstances in which it was used. In *Ulrich v. Kasco Abrasives Co.*, Ky., 532 S.W.2d 197 (1976), we decided that subsequent failure to keep the product in safe working order (faulty maintenance) was the sole cause of the disintegration of a grinding wheel and that original design was not a contributing factor. In *Hercules Powder Co. v. Hicks*, Ky., 453 S.W.2d 583 (1970), we decided dynamite was so inherently unsafe that it is unreasonable to blame the manufacturer for failure to warn when it exploded during careless handling. These are all cases where this court has decided that as a matter of law, because of the particular circumstances, the facts did not establish original manufacture of a product in a "defective condition unreasonably dangerous."

■ In general, the character of warnings that accompany the product at the time of sale are an evidentiary consideration in deciding whether the product is unreasonably unsafe. *Post v. Am. Cleaning Equipment Corp.*, Ky., 437 S.W.2d 516 (1968). But in *Sturm, Ruger & Co., Inc. v. Bloyd*, Ky., 586 S.W.2d 19 (1979), we held that the dangerous features attributed to the product, which was a replica of an 1873 model Colt revolver, were inherent in making a reasonable facsimile and that the warning to the purchaser, coupled with an extraordinary, unforeseeable use by the purchaser, was as much as the manufactur-

er could be expected to do in the circumstances.

In *Post v. Am. Cleaning Equipment Corp., supra*, we held that the product was unreasonably unsafe if there was failure to provide *adequate* warning to the *ultimate* user. We said by way of example:

> "(I)t may be doubted that a sign warning, 'Keep Off the Grass,' could be deemed sufficient to apprise a reasonable person that the grass was infested with deadly snakes." 437 S.W.2d at 520.

We held that additional warnings about the product (an industrial vacuum cleaner) contained in the instruction booklet delivered to the purchaser, who was the plaintiff's employer, did not affect the manufacturer's liability to the ultimate user, the employee.[1]

Subsequent warning, the problem in the present case, is different from the condition of the product at the time of manufacture. Even where it may be appropriate to decide that because of the warning that accompanied the product it was not in a defective condition unreasonably dangerous, it is an entirely different matter when the warning to the purchaser is subsequent to the sale and the manufacturer seeks to terminate liability for a product already marketed in an unreasonably unsafe condition without warning. This brings us to *Bohnert Equipment Co. v. Kendall*, Ky., 569 S.W.2d 161 (1978), the principal case cited on behalf of Montgomery Elevator. But, in proper perspective, *Bohnert* does not support Montgomery Elevator's position. Bohnert sold Kendall's employer, Reynolds Metal Co., an overhead crane. Bohnert claimed that it subsequently warned the purchaser, Reynolds Metals Co., that the overhead crane which it had sold to Reynolds was in danger of breaking loose at the hanger rods and falling because of certain characteristics in the design of the product and that Reynolds' supervisor agreed to take charge and assume responsibility for taking necessary steps to

---

1. *Post v. Am. Cleaning Equipment Co.* was decided in 1968, six years before *House v. Kellerman* in 1974, defining the status of the law on inter-

vening cause, so the question of adequate warning as an intervening cause was then viewed as a separate question for the jury.

correct the problem. Reynolds denied such claims.

The essence of *Bohnert* was an erroneous trial court instruction making the purchaser's failure to remedy a defect an intervening cause. The important point in *Bohnert* is that the trial court was *reversed* for giving such an instruction. The new instruction proposed by our Court as an alternative was an attempt to frame the intervening cause factual issue in the event the jury should believe Bohnert's claim that Reynolds had assumed responsibility for repair. So much of the *Bohnert* opinion as is subject to broader interpretation, is in conflict with this underlying principle and is overruled.

■ The sole question in a products liability case is whether the product is defective as defined in *Nichols v. Union Underwear, supra.* Adequate warnings and descriptive literature are evidentiary considerations. Like patent defects, adequate warning may terminate liability as to those who get the warning. But it has no effect on those who do not get the warning except in extraordinary circumstances as claimed in the *Bohnert* case.

In both the present case and in *Bohnert,* the question was why didn't you go and fix the defect instead of just telling the purchaser about it? In *Bohnert* the manufacturer claimed the purchaser not only had knowledge of the defect but assumed responsibility to fix it. That is not true here and it is an important distinction. In *Post v. Am. Cleaning Equipment Co., supra,* we held that warning to the purchaser with nothing more was no defense to an injury to an innocent third party. *Post* applies here.

We quote with approval the following from *Minert v. Harsco Corp.,* 26 Wash. App. 867, 614 P.2d 686 (Wash.1980):

"We agree that the manufacturer has a duty to warn the ultimate user of any dangers in its product (other than those that are open or obvious). *This duty is non-delegable....* If the injury was the result of the manufacturer's breach, the liability for the injury will lie with the manufacturer." *Id.* 614 P.2d at 691. (Emphasis added).

This quote expresses the rationale underlying our decision in *Post v. Am. Cleaning Equipment Co., supra.*

■ In the final analysis, as a general rule the purchaser's failure to remedy a defect in the product is no defense for the manufacturer where the claim is based on the defective condition of the product at the time of manufacture and is made on behalf of an ultimate user or bystander who has not been adequately warned of the danger. The manufacturer has a non-delegable duty to provide a product reasonably safe for its foreseeable uses, a duty not abrogated by warning to the immediate purchaser. The purchaser who has notice of the dangerous condition may be concurrently liable to the ultimate user for failure to provide adequate warning, for failure to remedy the defect or on some other basis, but the purchaser's failure to act is not an intervening cause except in extraordinary circumstances. *Nichols v. Union Underwear Co. Inc., supra,* is the law, and cases such as *Sturm, Ruger & Co., Inc. v. Bloyd, supra,* are the exception. *Bohnert Equipment Co. v. Kendall, supra,* where the manufacturer claimed that the purchaser was notified of the defect *and* assumed responsibility for correcting it, is limited to those facts.[2]

There are a number of lesser issues involved in this appeal.

■ Montgomery Elevator claims that the trial court's jury instructions were

---

**2.** Other leading cases holding that the manufacturer has a non-delegable duty to adequately warn the ultimate user of the product's dangerous propensities include *Pan-Alaska Fisheries, Inc. v. Marine Constr. & Design Co.,* 565 F.2d

1129 (9th Cir.1977); *Berkebile v. Brantly Helicopter Corp.,* 462 Pa. 83, 337 A.2d 893 (Pa.1975); *McKee v. Moore,* 648 P.2d 21 (Okla.1982); and *Miller v. Caterpillar Tractor Co.,* 697 F.2d 141 (6th Cir.1983).

erroneous in the form used to submit to the jury the question of apportionment between Montgomery Elevator and Federated Department Stores which owned and operated Shillito's. The jury found Federated Department Stores also at fault and apportioned liability 50/50 between Federated and Montgomery Elevator. Since the jury found Federated at fault, failure to direct a verdict as to its liability, if error, was harmless error. CR 61.01. The apportionment instruction was adequate and as such need not conform to the form provided in Palmore, *Kentucky Instructions to Juries,* § 20.02 (1975), to be appropriate.

Montgomery Elevator also complains that the trial court erred in permitting the introduction of evidence concerning a large number of other occurrences on escalators throughout the United States. The evidence to which Montgomery Elevator objects was on a list delivered to plaintiff in response to the following interrogatory:

"6. To your knowledge identify all persons previously injured by the escalator that is the subject of this lawsuit or any similar escalator in which a foot or toe was caught or wedged in the escalator."

The list was a computer printout "For Accident Code 01 Caught Between Escalator Step and Skirt." With few exceptions the accident description was "Foot Caught Between Step and Skirt."

■ In a products liability design defect case, such evidence of similar product failures under similar conditions is relevant and admissible. Such evidence "would tend to make the presence of a design defect more or less probable than it would be without the evidence." *Rhodes v. Michelin Tire Corp.,* 542 F.Supp. 60, 62 (E.D.Ky.1982). In a products liability case "such evidence may be admissible to show the danger (of the product) and the cause of the accident." Frumer & Friedman, *Products Liability,* § 12.01(2) (Matthew Bender, 1960 & 1982 Supplement), see cases cited therein.

■ In *Harris v. Thompson,* Ky., 497 S.W.2d 422, 429 (1973), we cite the general rule that "evidence of the occurrence or nonoccurrence of other accidents or injuries under substantially similar circumstances is admissible when relevant to ... the existence or causative role of a dangerous condition, or a party's notice of such a condition." Although, strictly speaking, a manufacturer is presumed to know all of the inherent characteristics of its product including its dangerous propensities (*Nichols v. Union Underwear, supra*), the first element expressed in *Harris,* "the existence or causative role of a dangerous condition," is generally accepted as a foundation of relevancy for such evidence in products liability cases.

■ A requirement of "substantial similarity" between the earlier accidents and the one at issue is a matter of relevance to be decided in the discretion of the trial judge and will not be reversed unless there has been an abuse of discretion. Federal Rules of Evidence § 401; Louisell and Mueller, *Federal Evidence,* § 981 (1978). The information on the list was both relevant and admissible.

■ In the present case, plaintiff called as a witness a Vice-President of Montgomery Elevator in charge of "risk management," and questioned him extensively regarding the list of accidents which had been furnished to plaintiff in response to the previously stated interrogatory, extracting much of the information as to which complaint is now made without objection. It was Montgomery Elevator who actually introduced the list, per se, as an exhibit before the jury, as its "Exhibit P". In light of the fact that the incidents on the list were furnished in response to a request for a list of injury on "any similar escalator in which a foot or toe was caught or wedged in the escalator," and that it was Montgomery Elevator that did in fact place the list before the jury as an exhibit, assuming there were accidents on the list of

such disparity that they should have been excluded, the error is not preserved. If there was an error, it was both waived and harmless in the circumstances.

On the appeal by Montgomery Elevator Co., 83–SC–428–DG, the Court of Appeals is affirmed. On the appeal on behalf of Kevin T. McCullough, a minor, 83–SC–442–DG, the Court of Appeals is reversed and the judgment of the trial court is affirmed.

STEPHENS, C.J., and AKER, GANT and LEIBSON, JJ., concur.

STEPHENSON, VANCE and WINTERSHEIMER, JJ., dissent.

STEPHENSON, J., filed dissenting opinion in which WINTERSHEIMER, J., joins.

STEPHENSON, Justice, dissenting.

I do not understand the lengthy discussion of "intervening cause" in the majority opinion. Section 402A of the *Restatement of Torts* contains very simple language and the Commentary is likewise explicit. I do not read "intervening cause" anywhere in 402A.

The most disturbing aspect of the majority opinion is the blithe assumption that the escalator is in a defective condition, unreasonably dangerous to the user or consumer. The statement in the majority that an escalator of safer design, guarding against the defect giving rise to the "tennis shoe" phenomenon, was being manufactured at the same time as the type sold to Shillito's is not factually correct.

It is interesting that the so-called safe design was being manufactured according to Canadian government specifications whereas the Shillito's escalator was manufactured according to United States government specifications. It is a misstatement to say that the Canadian design guarded against the defect. The argument is that there were fewer incidents with the Canadian design, not that there were no incidents. That statement makes me wonder what there is in the record to show this accident would not have happened had the escalator been designed according to Canadian standards. This leads me into another observation. From what I understand from the record, soft-sided shoes, such as tennis shoes, can be forced under the skirt of the escalator leading to accidents such as happened here. The Court of Appeals is exactly right in condemning the wholesale introduction of other incidents, stating that the introduction of the material should have been limited to similar incidents. In a way, the numbers here are without meaning unless there is some evidence of the numbers using this equipment. Before a *prima facie* case of being unreasonably dangerous can be made, there should be some comparison of these numbers. The number of incidents in evidence was approximately 500. Montgomery Elevator complains that many of them involved equipment manufactured by other concerns and a multitude of other type injuries. Anyway it is considered the number of incidents is meaningless unless there is some showing how many people used the escalators and how many escalators were used.

I believe this court is going too far in protecting people against themselves. In normal use, the equipment is not dangerous at all. A piece of equipment with moving parts can seldom, if ever, be rendered completely proof against someone using it in an abnormal fashion thereby causing injury.

The majority states that *Nichols v. Underwear* is a landmark case on the definition of a defective product. *Nichols*, of course, is the dangerous t-shirt case and is authority for a lawsuit based on anything an individual wears or uses provided, of course, that the individual does something to the product to cause injury to himself.

Both *Nichols* and the majority opinion here have effectively amended the meaning of § 402A and the Commentary which states that a product is not in a defective

condition when it is safe for normal handling and consumption.

We have a new standard that the product is defective and unreasonably dangerous if the user can somehow injure himself by use of the product.

Even more mind boggling is the approval of the "ordinarily prudent company" standard. I cannot imagine anything more stupefying to a jury than the task of wrestling with the "ordinarily prudent company" theory.

It occurs to me that under the standard set out in the majority opinion, every automobile accident could be tried under § 402A, because of a design defect which rendered the automobile unreasonably dangerous. Certainly we have more of these than escalator accidents. Applying this standard to automobiles would simplify many lawsuits and might lead to a cessation in their manufacture which would save many lives.

I am of the opinion Montgomery Elevator was entitled to a directed verdict in that there is no showing of a design defect, unreasonably dangerous to the user. This opinion and *Nichols* have effectively removed the word "unreasonably" from § 402A. The *Restatement* recognizes an element of danger in every product or piece of equipment. The operative word is "unreasonably."

Accordingly I dissent.

WINTERSHEIMER, J., joins this dissent.